**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

STELLA MUSGROVE,

      Plaintiff,

v.                                                          Case No:  6:14-cv-379-Orl-40GJK

CITY OF COCOA, FLORIDA,
BRANDON MCINTYRE, and ALAN
WORTHY,

      Defendants.

_____

## <u>ORDER</u>

      This cause comes before the Court without oral argument on Defendants' Motion for Summary Judgment and Memorandum of Law in Support Thereof (Doc. 43), filed May 4, 2015.  Plaintiff responded in opposition on May 26, 2015 (Doc. 47) and Defendants replied on June 9, 2015 (Doc. 51).  Upon consideration and review of the record as cited by the parties in their respective papers, the Court grants in part and denies in part Defendants' motion for summary judgment.

## I.     BACKGROUND

### A.     Facts

      This lawsuit arises out of Plaintiff Stella Musgrove's arrest by Defendants, Officer Brandon McIntyre and Officer Alan Worthy, in April 2011.  The parties generally agree to the facts leading up to police becoming involved.  At the time of the incident, Musgrove was living with her long-term boyfriend in an apartment immediately next door to Taylor Wimberly, Wimberly's wife, and their nine-month-old child.  In the early evening of April 12, Musgrove invited family over for dinner, drinks, and socializing.  As the night

1

progressed, and after a few beers, Musgrove turned on some music.  At approximately 1:00 a.m., Wimberly visited Musgrove and asked her to turn down the music, as he, his wife, and their child were trying to sleep.   Musgrove states that she complied with Wimberly's request.  Ten minutes later, Wimberly visited Musgrove's apartment a second time to again ask that Musgrove lower her music.  This visit, however, turned combative, with both Wimberly and Musgrove yelling, cursing, and exchanging racial epithets. Overhearing the commotion, Wimberly's wife called 911.

The parties' stories diverge from there.   According to Musgrove, police officers arrived at the apartment complex and knocked on her door.   Musgrove states that an officer informed her that he had received a noise complaint, but then turned around and walked away without further comment.   Musgrove closed the door to her apartment and sat down on the couch in her living room.   Musgrove then noticed flashes of light shining through her living room window, which she discovered were coming from police officers pointing their flashlights at her apartment.   After the lights stopped flashing, Musgrove exited her apartment to smoke a cigarette.   Musgrove states that while she was sitting on the step immediately outside her apartment smoking, she saw a police officer walk up the sidewalk toward her.   As Musgrove rose to meet the officer, the officer pulled out his Taser and shot her in the chest.[1]  (Doc. 39-1, 37:6–47:4).

---

[1]   The Taser used in this case works by shooting two barbs into the target's body.  These barbs are connected by wires to the handheld, battery-powered Taser unit, which then delivers an electrical current to the target for a period of several seconds.  Ideally, this electrical current causes the target's muscles to seize up, immobilizing the target as long as electricity is being applied.  Immediately after the electrical current ends, the target usually regains ordinary muscle function.  As long as the barbs remain in contact with the target's body and attached to the handheld Taser unit by the wires, an officer can discharge multiple electrical shocks, each for a period of several seconds.  Should the Taser lose its charge, lose contact with its barbs, or otherwise malfunction, an

After being stunned by the Taser, Musgrove states that she turned around to escape into her apartment.  As she crossed the threshold, two officers tackled Musgrove from behind, causing her to fall and land on her stomach.  As she lay on the floor, the officers discharged the Taser two more times.  After being shocked with the Taser the third time, Musgrove stood up and attempted to run to her bedroom.  As she made it through the bedroom doorway, the officers discharged the Taser a fourth time, causing her to collapse near her bed.  While lying on her side next to the bed, the officers shot Musgrove with a new Taser cartridge and shocked her a fifth and sixth time.  (*Id.* at 48:19–59:8).

The officers finally handcuffed Musgrove, removed her from the apartment, and rested her on her stomach on the grass outside.  While lying on the grass in handcuffs, one officer came over to Musgrove and sprayed her in the face with pepper spray.  Musgrove was then placed into a police car and transported to the Cocoa Police Department.  (*Id.* at 59:14–67:25).

According to Officers McIntyre and Worthy, they were the two police officers primarily involved in the events leading to Musgrove's arrest.  Both officers state that they arrived at the apartment complex to respond to a noise complaint.  After speaking with Wimberly, the officers confronted Musgrove outside her apartment and advised her that they were there because of her loud music.  Both officers state that Musgrove told them that she was not doing anything wrong and to leave her alone.  Musgrove then went back inside her apartment and slammed the door.  Officers McIntyre and Worthy returned to speak with Wimberly a second time in order to determine if he wished to press charges

---

officer can load a fresh cartridge into the Taser and shoot the target again with two new barbs.

against Musgrove.  During their conversation with Wimberly, Musgrove came out of her apartment multiple times to yell, curse, and scream at her neighbor.  After multiple incidents of Musgrove exiting her apartment to berate him, Wimberly informed the officers that he wanted to press charges against Musgrove for breach of the peace.  (Doc. 34-1, 6:9–9:20; Doc. 38-1, 9:21–18:12).

Officer Worthy then proceeded to Musgrove's apartment and waited directly outside the door for Musgrove to come out again.  As soon as Musgrove emerged, Officer Worthy grabbed her arm and informed her that she was under arrest.  To his surprise, however, Musgrove grabbed Officer Worthy's right arm and pulled him into her apartment. The two tussled in the living room as Officer Worthy tried to restrain Musgrove, resulting in Musgrove falling to the ground.  While on the ground, Musgrove kicked at Officer Worthy as he attempted to grab her arms to detain her.  At this point, Officer McIntyre entered the apartment to assist Officer Worthy.  Officer McIntyre then shot Musgrove with his Taser and discharged the Taser two times.  (Doc. 34-1, 9:25–11:3; Doc. 38-1, 22:18–30:6).

According to Officer Worthy, Musgrove stood up after being shocked twice by the Taser.  Officer McIntyre discharged the Taser a third time, causing Musgrove to fall into a glass coffee table.  Musgrove stood up a second time and bolted for her bedroom. Officers McIntyre and Worthy pursued Musgrove and tackled her from behind, causing Musgrove to fall onto the floor next to her bed.  While on the ground, Musgrove screamed, kicked, and tried to bite the officers.  Officer McIntyre therefore discharged his Taser a fourth time.  The officers finally subdued Musgrove, placed her in handcuffs, and led her outside.  On the way out of the apartment, however, Musgrove renewed kicking and screaming, causing Officers McIntyre and Worthy to tackle her onto the grass and Officer

McIntyre to spray Musgrove in the face with pepper spray.  Musgrove was then placed into a police car and transported to the Cocoa Police Department.  (Doc. 34-1, 11:4–21:1; Doc. 38-1, 30:20–48:3).

### B.    Procedural History

Musgrove initiated this lawsuit on March 7, 2014 by filing a five-count Complaint. (Doc. 1).  On June 27, 2014, Musgrove filed a six-count Amended Complaint, which remains her operative pleading in this action.  (Doc. 23).  Musgrove sues Officers McIntyre and Worthy in their individual capacities along with their employer, the City of Cocoa (the "City").  Musgrove has since voluntarily dismissed Counts II, III, and VI of her Amended Complaint, leaving three claims remaining.  (Doc. 31).  Those claims are for the excessive use of force in violation of the Fourth Amendment against the officers and the City (Count I), intentional infliction of emotional distress against the officers (Count IV), and negligent infliction of emotional distress against the City (Count V).  Defendants now move for summary judgment on all three counts.

## II.    STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A).  "The court need consider only the cited materials," but may also consider any other material in the record.  Fed. R. Civ. P. 56(c)(3).

An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law.  *Id.* The moving party bears the initial burden of identifying those portions of the record demonstrating a lack of genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  If the movant shows "an absence of evidence to support the nonmoving party's case," the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine disputes of material facts.  *Celotex*, 477 U.S. at 325; *see also Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

In determining whether a genuine dispute of material fact exists, the Court must read the record and the evidence presented in the light most favorable to the non-moving party.  *See Porter*, 461 F.3d at 1320.  Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

## III.   DISCUSSION

### A.   Count I: Section 1983 Excessive Force Claim

Section 1983 provides the procedural mechanism for vindicating constitutionally protected rights violated by persons who act under color of state law.  *Laster v. City of Tampa Police Dep't*, 575 F. App'x 869, 872 (11th Cir. 2014) (per curiam).  Included within the Fourth Amendment's protection against unreasonable searches and seizures is the guarantee that all individuals shall be free from the use of excessive force by police officers during the course of an arrest. *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011).  As such, a police officer violates the Fourth Amendment and will be liable

under § 1983 when he inflicts unreasonable injury while attempting to effect a suspect's arrest. *See id.* A municipality such as the City can also be liable for the unconstitutional actions of its officers, but only where the municipality is "found to have *itself* caused the constitutional violation at issue." *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1145 (11th Cir. 2007). Because the resolution of Musgrove's excessive force claim against the City depends on whether its police officers violated Musgrove's constitutional rights in effecting her arrest, the Court must first examine Count I with respect to Officers McIntyre and Worthy. *See Dahl v. Holley*, 312 F.3d 1228, 1236 (11th Cir. 2002) (holding that a municipality cannot be liable under § 1983 unless its officers violated the plaintiff's constitutional rights). The Court will then turn to the City's potential liability for the officers' actions.

### 1.    Officers McIntyre and Worthy

The Court begins by characterizing the nature of Musgrove's excessive force claims. Musgrove identifies two instances of excessive force by Officers McIntyre and Worthy. First, Musgrove alleges that, in attempting to effect an arrest for breach of the peace, the officers used excessive force when they initially shot Musgrove with a Taser without any warning or command and continued to shock Musgrove with the Taser although she never resisted, never acted threateningly or violently, and never attempted to flee. (Doc. 47, p. 12). Second, Musgrove alleges that Officer McIntyre used excessive force when he pepper sprayed Musgrove in the face while she was lying subdued in handcuffs on the grass outside her apartment. (*Id.* at p. 10).

Officers McIntyre and Worthy move for summary judgment on the grounds that they are entitled to qualified immunity. (Doc. 43, pp. 16–21). Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To receive qualified immunity, a government official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted).  A government official acts within his discretionary authority when he "perform[s] a legitimate job-related function . . . through means that were within his power to utilize."  *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate."  *Lee*, 284 F.3d at 1194.  To do so, the plaintiff must make a two-part showing.  First, she must demonstrate that the facts of the case, if proven to be true, would make out a violation of a constitutional right.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Beshers v. Harrison*, 495 F.3d 1260, 1265 (11th Cir. 2007).  Second, she must demonstrate that the constitutional right was "clearly established" at the time of the alleged misconduct.[2]  *Pearson*, 555 U.S. at 223.

Here, the parties do not dispute that Officers McIntyre and Worthy were acting within their discretionary authority when they responded to a 911 call regarding a noise complaint and arrested a suspect for breach of the peace.  Defendants therefore argue

---

[2]   The Court may address this two-part qualified immunity inquiry in any order, although the United States Supreme Court encourages courts to address the constitutional violation prong first in order to develop a body of clearly established law on the often fact-specific inquiries that arise in the context of § 1983 litigation.  *See Pearson*, 555 U.S. at 236 ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

that Musgrove cannot meet her two-part burden of showing that the facts of this case make out a violation of a constitutional right and that said constitutional right was clearly established at the time of the officers' misconduct.

"In an excessive force case arising out of an arrest, whether a constitutional violation occurred is governed by the Fourth Amendment's 'objective reasonableness' standard." *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008).  To that end, the force used by a police officer in effecting an arrest complies with the Fourth Amendment when an objectively reasonable officer confronted with the same circumstances would find that the force used is not excessive. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Importantly, the force used by an officer "must be judged on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993) (subsequent history omitted).  In measuring whether the use of force was reasonable, a court must consider myriad factors, including (1) the need for the force, (2) the proportionality of the force used in relation to its need, (3) the extent of the injury inflicted on the suspect, and (4) whether the force was applied maliciously or sadistically. *See* *Hadley*, 526 F.3d at 1329; *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002).

The facts in this case, if proven true, would establish the use of excessive force by Officers McIntyre and Worthy.  First, the need for force was low, as the officers intended to arrest Musgrove for a non-violent misdemeanor—breach of the peace.  Additionally, the need for force in effecting the arrest was minimal and the force actually used by the officers was disproportionate, as Musgrove produces evidence showing that she never resisted, acted violently, or attempted to flee.  Specifically, Musgrove testified at her deposition that, while she was sitting on her stoop smoking a cigarette, a police officer

walked up to her and shot her with a Taser without warning or command.  (Doc. 39-1, 46:5–47:4).  As she tried to escape into her apartment, Musgrove was tackled from behind and shocked with the Taser two more times.  (*Id.* at 48:19–53:9).  Musgrove attempted to escape a second time by running into her bedroom; however, she was shocked several more times with the Taser.  (*Id.* at 53:23–59:8).  Finally, the officers led Musgrove out of her apartment and sprayed her in the face with pepper spray despite the fact that she was already handcuffed on the ground and not resisting.  (*Id.* at 59:14–66:2).

Musgrove's boyfriend confirms that Musgrove never resisted arrest and testified that he begged the officers to stop shocking Musgrove with the Taser because he thought they were going to kill her.  (Doc. 36-1, 47:7–48:17, 50:12–58:17, 61:20–64:25).  Musgrove's account of the facts is further corroborated by her neighbor (Wimberly), who testified that he heard silence while police were trying to arrest Musgrove and then the sound of electricity from a Taser—indicating that Musgrove was not fighting with or resisting the officers prior to their initial use of the Taser.  (Doc. 35-1, 23:12–24:17).  Finally, the log from the Taser used against Musgrove confirms that it was discharged seven times within approximately two minutes.  (Doc. 47-2).

For the same reasons, the risk of flight by Musgrove was minimal, as the evidence produced by Musgrove shows that she was compliant at all times during her arrest.  Further, Musgrove's account of the facts indicates that Officer McIntyre and Worthy's conduct was malicious, as the officers applied a Taser several times to a submissive Musgrove and pepper sprayed Musgrove in the face while she was lying handcuffed and prone on the ground.  Accordingly, Musgrove meets her burden of establishing that the officers' use of the Taser and Officer McIntyre's use of pepper spray was excessive and in violation of her constitutional rights.

As to the second part of the qualified immunity showing, a constitutional right is clearly established at the time of the violation when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). "[T]he salient question . . . is whether the state of the law . . . gave [the officers] fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). To answer the "clearly established" inquiry, a court must first look to the words of the federal statute or constitutional provision in dispute. *Vinyard*, 311 F.3d at 1350. Where the words of the federal statute or constitutional provision are "so clear" and the conduct alleged by the plaintiff is "so bad," it is said that the case is one of "obvious clarity"; prior case law is unnecessary for an objectively reasonable officer to have fair warning that his conduct is unlawful. *Id.* Only when "the conduct is not so egregious" as to violate a federal statute or constitutional provision on its face does a court then turn to case law. *Id.* at 1351.

With regard both to the officers' use of the Taser and to Officer McIntyre's use of pepper spray, the Court need not turn to pre-existing law, as the words of the Fourth Amendment and the conduct alleged by Musgrove form a case of "obvious clarity." The state of the law in April 2011 was clearly established that Officer McIntyre's and Officer Worthy's conduct violated Musgrove's constitutional rights. No objectively reasonable police officer facing Officer McIntyre and Worthy's situation would believe that he could lawfully shoot a suspect with his Taser without any warning or command and continue to shock the compliant suspect several times in order to complete an arrest for breach of the peace. Likewise, no objectively reasonable police officer facing Officer McIntyre's situation would believe he could lawfully pepper spray an arrestee in the face where the arrestee was lying on the ground in handcuffs not resisting or acting violently. *See also*

*id.* at 1355 (finding that officer who pepper sprayed arrestee who was handcuffed and secured in backseat of patrol car for screaming at and exchanging obscenities with the officer formed a case of obvious clarity).  The conduct Musgrove describes clearly goes beyond the boundaries of reasonable force permitted on the face of the Fourth Amendment.  As a result, Musgrove meets her burden of showing that the constitutional right she alleges was clearly established at the time of the incident.  The Court will therefore deny qualified immunity to Officers McIntyre and Worthy.

### 2.    The City

Having found that Officers McIntyre and Worthy are not entitled to qualified immunity, the Court must now determine whether the City can be held liable for the officers' conduct as their employer.

As mentioned briefly above, a municipality such as the City is only responsible for the unconstitutional conduct of its officers when the municipality itself caused the constitutional violation.  *Skop*, 485 F.3d at 1145.  A municipality can only cause a constitutional violation when it acts "pursuant to [an] official municipal policy of some nature."  *Monell v. Dep't of Social Servs. of City of NY*, 436 U.S. 658, 691 (1978).  Therefore, a plaintiff who intends to impose liability against a municipality must show a "direct causal link" between a municipal policy and her constitutional injuries.  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).  In the instant case, Musgrove intends to impose liability against the City under two theories: (1) that the City had a policy or custom of excessive Taser use, and (2) that the City failed to adequately train its police officers in the lawful use of Tasers.  (Doc. 23, ¶¶ 21–23).  The Court examines each theory in turn.

### a.     Policy or Custom

Municipal policy can come in different forms.   Intuitively, the most obvious examples are officially promulgated ordinances, rules, regulations, codes, or a decision rendered by a policymaker.   *See, e.g.*, *Monell*, 436 U.S. at 694–95; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion).   Less-than-formal policies may also cause constitutional violations that subject a municipality to liability, such as when the plaintiff's constitutional injuries are caused by an unofficial custom or practice of the municipality that is so well-settled, permanent, pervasive, and wide-spread "that it takes on the force of the law."   *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004).

Regardless of whether a policy takes the form of an official policy or an unofficial custom, a municipality will only be held responsible "for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."   *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403–04 (1997).   A municipality will not be liable under § 1983 for random acts, isolated incidents, or customs or practices of which its policymakers were unaware.   *Depew v. City of St. Marys, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986). Therefore, although a policy or custom need not receive formal approval, the plaintiff must show actual or constructive knowledge of the unconstitutional policy or custom by a municipal policymaking body.   *Id.*

In their motion for summary judgment, Defendants demonstrate that no City policy or custom directly caused Musgrove's constitutional injuries.   First, the City shows that Cocoa Police Department Standard Operating Procedure 650 ("Procedure 650") was in effect and enforced at the time of Musgrove's arrest.   (Doc. 47-8).   Procedure 650 is the City's official written Taser utilization policy and covers a wide range of topics, from

procedures on how and when to deploy a Taser to care and maintenance for the Taser.[3]
(*Id.*).  Regarding use of a Taser, Procedure 650 provides extensive guidance, including
that officers should only use a Taser "to prevent violent or escalating confrontations," that
an officer must loudly and clearly announce his intent to use a Taser, and that officers
should avoid using Tasers in dangerous situations, such as when a suspect is standing
on a rooftop, in water, or near flammable liquids.  (*Id.* at pp. 2–4).  Procedure 650 further
mandates that an officer discharge his Taser "only until the threat is neutralized" and that
he must stop discharging the Taser once the conduct justifying its use has ended.  (*Id.* at
p. 2).  The City additionally shows that all officers who equip a Taser must also complete
a comprehensive annual training program on its safe operation, which also encompasses
the topics addressed by Procedure 650.  (*Id.* at p. 7; Doc. 42-1).

The City further shows that any custom of its police officers to disregard
Procedure 650 or to otherwise improperly operate their Tasers was unknown to the City.
(Doc. 43, pp. 13–14).  In support, the City produces evidence that Officers McIntyre and
Worthy have never been disciplined for using excessive force or for improperly operating
their Tasers.  (Doc. 34-1, 28:4–29:13; Doc. 38-1, 58:4–15).  The City additionally shows
that it investigates allegations of excessive force and disciplines officers who are found
to have violated its policies regarding the use of force.  (*See* Doc. 40-1, p. 3).  Therefore,
any custom of ignoring policies on the use of force would not have been condoned by the
City.

In her response, Musgrove argues that Procedure 650 is constitutionally
inadequate and directly caused her constitutional injuries because the policy allows for

---

[3]   Procedure 650 is attached to this Order as Appendix A.

the "virtually unlimited use of tasers." (Doc. 47, p. 15). Musgrove contends that Procedure 650 is deficient because it does not prohibit the repeated or prolonged use of Tasers against suspects and provides no caution on the risks of using a Taser. (*Id.* at pp. 15–16). Moreover, Musgrove submits that the City and its officers encouraged a custom of ignoring safe and lawful Taser practices. (*Id.* at p. 16).

However, Musgrove's arguments find no traction in the record. Procedure 650 directly contradicts Musgrove's position that the City allowed "virtually unlimited use of tasers." As discussed above, Procedure 650 offers extensive guidance on the use of Tasers, including specifically advising against the prolonged and repeated use of Tasers and thoroughly cautioning officers on conditions which may render Taser use too dangerous. (Doc. 47-8). Musgrove also produces no affirmative evidence indicating that there was a custom—much less knowledge by the City of such a custom—of ignoring Procedure 650 or the mandatory annual Taser training. Indeed, the record produced by Musgrove indicates that the circumstances of her arrest appear to be a random or isolated incident for which the City cannot be held accountable. *Depew*, 787 F.2d at 1499. For these reasons, Musgrove fails to genuinely dispute that no City policy or custom directly caused her constitutional injuries.

### b.    Failure to Train

A municipality's failure to train its employees regarding their duty not to violate citizens' constitutional rights can also rise to the level of policy where the failure to train is the result of the municipality's deliberate indifference toward constitutional rights. *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011); *City of Canton*, 489 U.S. at 388. A plaintiff can prove a municipality's deliberate indifference in one of two ways. First, a municipality is deliberately indifferent to constitutional rights where there is a widespread

pattern of similar constitutional violations by untrained employees. *Connick*, 131 S. Ct. at 1360. Alternatively, a municipality can be liable for a single incident where "the need for more or different training is so obvious, and the inadequacy [in training is] so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent." *City of Canton*, 489 U.S. at 390. However, showing that the level of training provided is not optimal or even preferable is not enough to rise to the level of deliberate indifference. *Id.* at 391; *Marrero-Rodriguez v. Municipality of San Juan*, 677 F.3d 497, 503 (1st Cir. 2012) ("[T]he fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to [show deliberate indifference].").

Defendants demonstrate that the City's mandatory annual Taser training does not amount to deliberate indifference. Defendants again point to Procedure 650 and show that the training program mirrors the policy's guidance. (Doc. 43, p. 15). That is, the City shows that its mandatory annual training covers subjects such as using a Taser only to subdue violent and escalating conduct, deploying a Taser only until the conduct which justified its deployment has ended, avoiding repeated use of a Taser, and allowing a subject to comply before using a Taser multiple times. (Doc. 42-1). Defendants therefore contend that the City's Taser training cannot be so obviously deficient and so likely to lead to constitutional violations as to evince deliberate indifference toward constitutional rights. Defendants further argue that Musgrove cannot cite any other incident—let alone a widespread pattern of incidents—where its officers unlawfully used Tasers. Thus, Defendants conclude that the City could not have had any knowledge that its training was constitutionally insufficient.

In response, Musgrove essentially relies on the bald conclusion that the City's training was inadequate. (Doc. 47, p. 16). Musgrove does not produce any other incident of similar constitutional violations by the City's officers and again argues that the City should have trained its officers against the prolonged and repeated use of Tasers, despite the fact that both Procedure 650 and the City's mandatory annual training explicitly address these topics. To the extent Musgrove contends that the City's training program should also reference manufacturer warnings and instructions, the fact that training does not take the form she prefers is not enough to rise to the level of deliberate indifference. *Marrero-Rodriguez*, 677 F.3d at 503. Because the City's mandatory annual Taser training is not otherwise so obviously inadequate or so likely to lead to constitutional violations, Musgrove also fails to genuinely dispute that the City's training shows no deliberate indifference toward constitutional rights. Accordingly, summary judgment will be granted in favor of the City on Count I.

### 3. Punitive Damages Against Officers McIntyre and Worthy

One final matter remains as to Count I: Defendants move for summary judgment on the issue of whether Musgrove can recover punitive damages from Officers McIntyre and Worthy. (Doc. 43, p. 22). It is well-settled that a plaintiff may recover punitive damages in a § 1983 lawsuit. *Smith v. Wade*, 461 U.S. 30, 35 (1983). In order to do so, the plaintiff need only show that the defendant acted with "reckless or callous disregard" for her constitutional rights. *Fields v. Corizon Health, Inc.*, 490 F. App'x 174, 186 (11th Cir. 2012) (per curiam).

Here, Defendants merely conclude, without citing any evidence, that Musgrove cannot show sufficiently reckless or callous conduct by Officers McIntyre and Worthy to warrant an award of punitive damages. Presumably, Defendants rely on the officers'

respective accounts of the night in question.  However, as previously discussed in this Order, the parties' recollection of what happened vary drastically.  Musgrove maintains that the officers tased her without warning, tackled her, tased her several more times although she never resisted, handcuffed her, laid her in the grass outside, and sprayed her in the face with pepper spray all in order to complete an arrest for breach of the peace. (Doc. 39-1, 37:6–67:25).  Musgrove's version of the facts is corroborated by both her boyfriend and her neighbor, (Doc. 35-1, 23:12–24:17; Doc. 36-1, 47:7–48:17, 50:12–58:17, 61:20–64:25), and the log for the Taser used against Musgrove confirms that the Taser was discharged several times within two minutes, (Doc. 47-2).  Accordingly, there is copious record evidence that would allow a rational jury to conclude that Officers McIntyre and Worthy acted with reckless or callous disregard for Musgrove's constitutional rights.  Defendants' motion for summary judgment will therefore be denied on the issue of punitive damages.

### B. Count IV: Intentional Infliction of Emotional Distress Against Officers McIntyre and Worthy

Count IV alleges a claim for intentional infliction of emotional distress ("IIED") against Officers McIntyre and Worthy.  In order to recover for IIED, Florida law requires a plaintiff to prove four elements: (1) the defendant acted intentionally or recklessly, (2) the defendant's conduct was outrageous, (3) the defendant's conduct caused emotional distress to the plaintiff, and (4) the plaintiff's emotional distress was severe.  *Stewart v. Walker*, 5 So. 3d 746, 749 (Fla. Dist. Ct. App. 2009).  Defendants move for summary judgment on the grounds that Musgrove cannot prove that the conduct she alleges is sufficiently outrageous.  (Doc. 43, pp. 22–23).

"The standard for 'outrageous conduct' is particularly high in Florida." *Patterson v. Downtown Med. & Diagnostic Ctr., Inc.*, 866 F. Supp. 1379, 1383 (M.D. Fla. 1994). Conduct is outrageous where "it is so extreme in degree as to go beyond the bounds of decency and be deemed utterly intolerable in a civilized community." *Clemente v. Horne*, 707 So. 2d 865, 867 (Fla. Dist. Ct. App. 1998) (quoting Restatement (Second) of Torts § 46 cmt. d). It is insufficient to show tortious or criminal intent and "it is not enough [to show] that the defendant intended to inflict emotional distress." *State Farm Mut. Auto. Ins. Co. v. Novotny*, 657 So. 2d 1210, 1212 (Fla. Dist. Ct. App. 1995). Instead, "the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Clemente*, 707 So. 2d at 867 (quoting Restatement (Second) of Torts § 46 cmt. d). Ultimately, the determination of outrageousness is intensely fact sensitive. *See Johnson v. Thigpen*, 788 So. 2d 410, 413–14 (Fla. Dist. Ct. App. 2001).

In challenging whether Musgrove alleges sufficiently outrageous conduct, Defendants take issue with a specific allegation in the Amended Complaint that one of the officers threatened to give Musgrove a "tune up." (Doc. 43, p. 23). Defendants contend that this singular comment cannot amount to outrageous conduct. However, Defendants ignore the bulk of the remaining conduct at issue in this case—namely, that Officers McIntyre and Worthy shot Musgrove with a Taser without warning, continued shocking Musgrove despite the fact that she never resisted, never posed a threat to anyone, and never attempted to flee, and pepper sprayed Musgrove in the face while she was lying compliantly in handcuffs on the ground. Accordingly, the Court finds that Defendants fail to carry their initial burden of showing no genuine dispute of material fact

on whether the conduct Musgrove alleges was sufficiently outrageous to form an IIED claim.  Defendants' motion for summary judgment will be denied as to Count IV.

### C.      Count V: Negligent Infliction of Emotional Distress Against the City

Count V alleges a claim for negligent infliction of emotional distress ("NIED") against the City.[4]  Musgrove premises her NIED claim on the theory that the City is liable for Officer McIntyre and Worthy's negligent infliction of physical impacts against her during the arrest.  (Doc. 23, ¶¶ 46–53; *see also* Doc. 47, p. 18).

In general, an employer such as the City can be held liable for the negligent conduct of its employees.  *Lewis v. City of W. Palm Beach*, No. 06-81139-CIV, 2008 WL 763250, at *10 (S.D. Fla. Mar. 19, 2008) (subsequent history omitted).  "However, Florida law does not recognize a cause of action for the negligent use of force in making an arrest."  *Feliciano v. City of Miami Beach*, 847 F. Supp. 2d 1359, 1367 (S.D. Fla. 2012).  Indeed, Florida courts are clear that "it is not possible to have a cause of action for 'negligent' use of excessive force because there is no such thing as the 'negligent' commission of an 'intentional' tort."  *City of Miami v. Sanders*, 672 So. 2d 46, 48 (Fla. Dist. Ct. App. 1996), *review denied*, 683 So. 2d 484 (Fla. 1996); *cf. Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1263 (11th Cir. 2001) (holding that Florida law recognizes

---

[4]    Although no party raises the issue, the Court finds that sovereign immunity does not bar Musgrove's state law NIED claim against the City.  Generally, Florida municipalities such as the City are immune from tort liability.  *See* Fla. Const. art. X, § 13.  However, the State of Florida has waived sovereign immunity for its municipalities under circumstances where a private person could be held liable for the conduct alleged. Fla. Stat. § 768.28(1).  Nevertheless, this limited waiver of sovereign immunity will not apply—and therefore a lawsuit will be barred—where the tortious conduct the plaintiff describes derives from the municipality's performance of a discretionary function.  *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1262 (11th Cir. 2001).  It is well-settled that an officer's conduct in effecting an arrest does not constitute discretionary conduct that will bar a lawsuit on the grounds of sovereign immunity.  *Id.* at 1264–65.

negligence claims against police only when the negligent conduct occurs "separate and distinct from an excessive force claim"). Because Musgrove's NIED claim arises directly out of a claim that the City is responsible for Officer McIntyre and Worthy's negligent use of force, it is not cognizable under Florida law. The Court will therefore grant summary judgment in favor of the City on Count V.

## IV.   CONCLUSION

For the aforementioned reasons, it is **ORDERED AND ADJUDGED** that Defendants' Motion for Summary Judgment (Doc. 43) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. As to Count I: Defendants' Motion for Summary Judgment is **GRANTED** in favor of Defendant City of Cocoa, Florida only. Defendants' Motion for Summary Judgment is otherwise **DENIED**. Defendants Brandon McIntyre and Alan Worthy shall proceed to trial on Count I.

2. As to Count IV: Defendants' Motion for Summary Judgment is **DENIED**.

3. As to Count V: Defendants' Motion for Summary Judgment is **GRANTED**.

**DONE AND ORDERED** in Orlando, Florida on September 14, 2015.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record

## **APPENDIX A**

**POLICY, PROCEDURES AND RULES**　　　　　　**POLICY NO.　650**

| TASER® Utilization | | |
|---|---|---|
| Date Effective:  04-15-05 | CFA: 4.07, 4.08, 4.09 | |
| Date Revised: 8/21/12 | 14.11 | |
| Date Reviewed: 00-00-00 | | |
| Replaces SOP # 0000 | F.S.S.: 776.05, 776.06, 776.012 | |

## I.　PURPOSE:

To establish guidelines for the use of the "Advanced Air TASER®", hereinafter referred to as the TASER®, and prescribe safe practices concerning the training, handling, carriage, and storage of TASER® probes after use of the TASER®.

## II.　POLICY:

It shall be the policy of the Cocoa Police Department to provide officers with less-lethal alternatives to physical and/or deadly force responses to resistance, while taking into account each citizen's constitutional rights and protections, and minimizing injury for all parties involved.

## III.　DEFINITIONS:

A.　***TASER®:*** An electro-muscular disruption technology (EMDT) device with the capability of disrupting the body's ability to communicate messages from the brain to the muscles causing temporary motor skill dysfunction to a subject.

B.　***Drive Stun:*** A secondary function of the TASER® is to stun a subject by making direct contact with the body after the air cartridge has been expended or removed.

C.　***Air Cartridge:*** A replaceable cartridge for the TASER® which uses compressed nitrogen to fire two barbed probes on thin connecting wires sending a high voltage/low current signal into a subject.

D.　***Less-Lethal Force***: A concept of planning and force application which meets operational objectives, with less potential for causing death or serious physical injury.  Less-Lethal Force is force that is intended to incapacitate a subject with a minimal possibility of causing great bodily harm or death.

E.　***Sensitive Tissue Area***: Areas of the body which are especially sensitive to injury.  These areas include the head, face, neck, groin, genitals, and female breast.

F.　***Smart Cartridge:*** Contains small circuit board that communicates cartridge type (live vs. LS simulation), distance (15, 25 or 35) and status (loaded vs. deployed) to the X2 ECD.  Contains the nitrogen propulsion system, probes, TASER® wire, and Anti-Felon Identification (AFID) tags found in the TASER® Air Cartridge.

## IV.　PROCEDURE:

A.　Deployment Authorization: **[CFA 4.07]**

　　1.　The TASER® is just one of the options available to officers.  The TASER®, like the impact weapon, chemical agents or empty hand techniques may not be effective in every situation.  Officers must access the effectiveness of each application and determine whether further applications are warranted or a different tactic should be employed.  The decision to use the TASER® shall be dependant upon the actions of the subject, the threat facing the officer(s) and/or public, and the totality of the circumstances surrounding the incident.

COCOA000000167

23

2. The TASER® may be utilized in order to provide a level of protection for the officer(s) and/or other persons from an immediate assault and/or to overcome an overtly resistive or combative person who is being taken into custody.

3. The utilization of the TASER® shall constitute a use of force. The TASER® shall be utilized whenever other appropriate forms of affecting a lawful arrest have been unsuccessful. In accordance with FSS 943.1717, the decision by a law enforcement officer to utilize a TASER® must involve an arrest or a custodial situation during which the person who is the subject of the arrest or custody escalates resistance to the officer from passive physical resistance to active physical resistance and the person:
   a. Has the apparent ability to physically threaten the officer or others; or
   b. Is preparing or attempting to flee or escape.

4. The TASER® should be utilized before an officer attempts to use any empty hand striking technique or impact weapon, if such TASER® utilization does not put the officer at risk of physical injury. The TASER® is authorized under the Response to Resistance.

5. The TASER® shall be utilized only until the threat is neutralized. When the behavior that justified the utilization of the TASER® ends, the officer must stop the use of the TASER®.

6. Use of the "Drive Stun" is discouraged except in situations where the "probe" deployment is not possible and the immediate application of the "Drive Stun" will bring a subject displaying active, aggressive or aggravated aggressive resistance safely under control. Multiple "Drive Stuns" are discouraged and must be articulated on the "Response to Resistance" report. If initial application is ineffective, officer(s) shall reassess evaluate the situation and consider other available options.

7. The TASER® is classified as "Less-Lethal Force" technology and equipment. It should be utilized in an attempt to prevent violent or escalating confrontations.

8. The TASER® may be utilized on animals when necessary. Due to the spread of the probes, the device may not be effective on animals.

9. Only Department issued, properly functioning and charged TASERs® shall be carried on duty. [CFA 4.07]

10. Officers shall have the option of carrying the TASER®, chemical agents, or both.

11. Officers are not authorized to withdraw or display the TASER®, except for Department authorized training purposes, during inspections, during Department sanctioned demonstrational / educational purposes and/or during the required daily spark test (as outlined within this policy), unless the circumstances create reasonable belief that it may be necessary to utilize it.

B. Deployment Guidelines:

   1. USE COMMON SENSE!

   2. If the situation permits, the officer shall provide loud and clear verbal commands as to the intent to discharge the TASER®.

   3. The TASER® is programmed to give a five (5) second burst of "electrical current". The operator can shorten or extend this time period if the situation warrants such. Anyone touching the probes and/or wire leads during this time shall receive the same "electrical current" as the subject. Officers should take caution in order to avoid tripping or stepping on the wires.

   4. Have a second air cartridge present in case the probes of the first TASER® miss the target, a malfunction occurs, or if the cartridge misfires.

5. Utilize backup units and/or arrest teams whenever possible. Subjects may be handcuffed while the TASER® is in operation.

6. Notify all officers on the scene that the TASER® is about to be deployed.

7. Aim to the center of mass and from the rear of the subject, if possible. Watch for thick and/or loose clothing. If the probes hit clothing, the electrical current can only penetrate a maximum of 2.25 inches.

8. When encountering subjects wearing loose or heavy clothing on the upper body, the legs may be considered as an alternate target.

9. Use cover and distance to enhance officer safety.

10. If a target runs, the officer must run also to prevent wires from breaking.

11. Avoid utilizing the TASER® on subjects near slanted rooftops, on the edges of tall buildings, on docks or near bodies of water, or other locations where falling has a risk of serious injury or drowning.

12. The TASER® is laser sighted and should never be aimed at the subject's eyes or face and should not be utilized merely as a pointing device within the public's view.

13. Hands should be kept away from the front of the unit at all times, unless the safety switch is engaged and the TASER® is deactivated.

14. The TASER® shall not be fired near flammable liquids or fumes, as it may ignite gasoline, fumes or other flammable materials. Some self-defense sprays and/or chemical agents are flammable and may be extremely dangerous to use in conjunction with the TASER®.

15. The TASER® shall not be utilized:
    a. When the officer knows a subject has come in contact with flammable liquids or is in a flammable atmosphere;
    b. When the subject is in a position where a fall may cause substantial injury or death;
    c. Punitively for purposes of coercion, or in an unjustified manner;
    d. To escort or "jab" individuals;
    e. To awaken unconscious or intoxicated individuals;
    f. When a subject is visibly or reportedly pregnant, unless deadly force is the only other option.

16. The TASER® should not be utilized in the following circumstances (unless there are compelling reasons to do so which can be clearly articulated):
    a. When a subject is operating a motor vehicle;

    b. When the subject is holding a firearm;

    c. When the subject is handcuffed;

    d. When the subject is standing in or near a body of water;

    e. In a situation where deadly force is clearly justifiable unless another officer is present and capable of providing deadly force to protect the officers and/or civilians present.

    f. When the subject obviously appears to be at the extremes of age (young and/or elderly) and/or physically disabled;

~~17. If an officer request for medical treatment; the subject will be transported to a medical facility for medical clearance even if the subject was not tased in a sensitive area.~~

**Note:** *With the rising concerns for the proper utilization of the TASER®, officers should continue to use good sound judgment when deploying these alternatives. The safety of the officers and innocent bi-standers shall remain paramount in all situations. However, when encountering individuals who obviously meet this description, officers shall endeavor to exhaust all other means possible of safe apprehension prior to deploying the TASER®, keeping in mind officer safety based upon the circumstances at hand.*

C. **Post-Deployment Requirements:**

1. Secure the subject and immediately notify the on-duty shift supervisor.

2. Seek medical treatment for the subject if struck in a sensitive tissue area and/or if the subject has sustained an injury. [CFA 4.09]

3. Treatment of persons subjected to TASER® or probes: [CFA 4.09]
   a. Officers shall seek medical treatment for the subject(s) who have been struck by the probes in a sensitive tissue area of the body, to have the probes removed by medical personnel. The probes of the TASER® are #8 straightened fishhooks that can penetrate a maximum of one quarter or one half inch.
   b. When injuries stemming from the subject falling down require immediate medical treatment, the subject shall be transported by ambulance to the appropriate medical facility.
   c. When the subject is obviously or has been reported to be under the influence of alcohol and/or drugs, but shows no obvious signs or symptoms that their normal faculties may be impaired, the subject shall remain under the constant supervision of a sworn officer until such time that the subject is released to another facility.
   d. When it has been determined that the subject is under the influence of alcohol and/or drugs to the point where his/her normal faculties may be impaired, the subject shall be transported to the hospital by ambulance.
   e. When releasing a subject who has been subjected to the effects of a TASER® to another facility, the transporting and/or releasing officer shall inform the accepting party that the subject has been subjected to the TASER® and whether or not medical treatment was required and/or provided. Documentation of the notification, including the accepting individual's name, shall be indicated in the officers' written report. [CFA 4.08C]
   f. Officers may remove the probes from the subject if they are located in a non-sensitive area; however, officers should utilize latex/rubber gloves and a bio-medical solution to treat the probes and the officer's hands (remember to keep fingers away from the barbs on the probes).
   g. If the subject has been transported to a medical facility, officers should get medical clearance from a qualified medical nurse or doctor prior to transport to the jail.
   h. In accordance with the countywide EMS protocol, if medical personnel have been summoned to respond to the scene and/or the Police Department for a subject who has been subjected to a TASER® and/or probes, the subject shall be transported to the hospital by ambulance and accompanied by a law enforcement officer. These subjects shall be considered incompetent to sign a refusal for treatment.

4. Dispose of probes in accordance with biohazardous 'sharps' procedures.

5. Photograph the areas of the probe strikes (including drive stuns), if possible, before and after probe removal, as well as any secondary injuries which may have been caused by falling down, etc. All photographs shall be attached to the "Response to Resistance" report.
   a. Consent should be obtained prior to photographing personally sensitive areas.
   b. Officers shall refrain from taking photographs of personally sensitive areas of subjects who may be of the opposite gender.

6. Document use of the TASER® on the "Response to Resistance" report. The report shall include the serial number of the air cartridge, if one was used.

**D. Reporting Requirements:** [CFA 4.08C]

1. Reporting Requirements: There are three (3) separate types of mandatory reportable TASER® applications. Utilization of any one or a combination of any of the following methods shall require a mandatory "Response to Resistance" report to be completed in accordance with established Departmental policies:

   a. *Spark Display:* A non-contact demonstration of the TASER's® ability to discharge electricity. This is conducted only when the cartridge has been removed from the weapon for the M26 and X26 TASER® or when the ARC Switch has been pressed for the X2 TASER® without removing the cartridges. The purpose of this display is to convince the subject to comply with a lawful order and avoid the TASER® being deployed in the Drive Stun or Probe mode.

   b. *Drive Stun:* Contact is made by pressing the front of the TASER® (cartridge expended and/or removed for the M26 and X26 TASER® or the cartridges still in for the X2 TASER®) into the body of a subject resisting lawful orders, and activating the TASER®. The Drive Stun causes significant localized pain in the area touched by the TASER® but does not have a significant effect on the central nervous system. The Drive Stun does not incapacitate a subject but may assist in taking a subject into custody. If a TASER® is fired using the cartridge, at a distance of less than three (3) feet, the effect will be very similar to a Drive Stun.

   c. *Probe:* The TASER® is most effective when the cartridge is fired and the probe/darts make direct contact with the subject. Proper application will result in temporary immobilization of the subject and provide the officer(s) a "window of opportunity" in which to take the subject safely into custody. Optimum range for probe deployment is seven (7) to fifteen (15) feet with a twenty-one (21) – twenty-three (23) foot maximum distance. Deployment of the TASER® cartridge at distances of less than three (3) feet will not result in temporary immobilization or central nervous system disruption.

2. Each discharge, including inadvertent discharges, of the TASER® shall be documented by the officer on a Response to Resistance Report (Form # CPD 600-1). This report shall be turned in to the on-duty supervisor prior to the end of the shift in which the TASER® was discharged. The TASER® may occasionally be test fired, without the air cartridge installed, in order to confirm operational readiness. Such test firing, and/or authorized training, shall not require documentation.

**E. Supervisory Responsibilities:**

1. To monitor the use of the TASER® and ensure that all incidents involving the discharge of the TASER® are investigated and properly documented.

2. If an officer who utilized the TASER® is, for whatever reason, unable to file the required report, the officer's supervisor shall file a complete detailed written report as soon as possible pending further departmental investigation. [CFA 4.08C]

3. To ensure TASERs® are issued to and/or carried by only trained officers.

4. To respond to all scenes and/or the Police Department whenever a TASER® has been discharged.

5. To ensure that photographs are taken of probe penetration sites and any secondary injuries caused by falling down, etc. ~~35mm and/or digital cameras should be used in lieu of Polaroid photography.~~

COCOA000000171

6. To ensure that probes are disposed of properly, as bio hazardous 'sharps'.

7. To ensure that subjects who appear to be under the influence of drugs and/or alcohol, to the point where their normal faculties may be impaired, receive immediate medical assistance and/or clearance. [CFA 4.09]

## F. Care and Maintenance:

1. Each officer who is certified and authorized to carry a TASER® is solely responsible for the care, cleanliness and all use and/or misuse of the TASER®.

2. The TASER® is a sensitive electronic product and a costly device, and should be encased in its protective holster when not in use. Care should be taken to avoid dropping the TASER® and to assure that the TASER® is adequately secured while being transported in vehicles. Direct sunlight, heat, or pressing on the faceplate may cause the cover to disengage from the air cartridge.

3. Once a week, the M-26 TASER® batteries shall be charged when the spark test becomes sluggish, to ensure the proper use of the device. Failure to charge the TASER® batteries will minimize the effect of the TASER®. Upon changing the batteries, the TASER® should be test fired without a cartridge installed, to ensure operational readiness.

4. The X-26 TASER® and X2 TASER® battery display shall be checked prior to the beginning of each tour of duty. A reading of 20% or less shall require the DPM/battery pack be changed. The DPM/battery pack shall not be removed from the TASER® except when the reading is 20% or less or to conduct a data download.

5. The X-26 TASER® and X2 TASER® shall never be stored more than 48 hours without the DPM/battery pack attached.

6. When off-duty, TASERs® must be stored and secured in a climate-controlled area (i.e. locker), not in a vehicle.

7. Officers must shall conduct a spark check at the beginning of each tour of duty to ensure the TASER® will function properly. A spark check is an equipment check conducted outside of public view to ensure the TASER® is operable. It is conducted by removing the cartridge for the M26 and X26 TASER®, and pressing the ARC Switch on the X2 TASER® without removing the cartridges, thus, test firing the weapon and observing the electrical arc. This spark check does not require completion of a "Response to Resistance" report.

8. Any TASER® that does not satisfactory pass the spark check or that appear to be "sluggish" in nature shall be taken out of service immediately.

9. Uniformed officers who are authorized and have been issued a TASER® shall carry the TASER® in a department issued holster. The TASER® and holster shall be carried on the duty belt on the side opposite the duty firearm.

10. Officers shall not tamper with or attempt to modify the TASER® in any manner. Only authorized personnel shall attempt to download data from the TASER® data port.

11. On a semi-annual basis, or when a complaint has been lodged involving the utilization of a TASER®, the Professional Compliance Supervisor or his/her designee shall download data from all TASER® data ports to ensure the integrity of the system and the accuracy of the information and the internal clocks. This information shall be maintained by the Professional Compliance Supervisor or his/or designee (or maintained on Evidence.com in the agency's account).

COCOA000000172

12. Air cartridges will be removed from service and replaced when they are expired. Expired cartridges will then used for training purposes.

**G. Training:** [CFA 4.07C]

1. In accordance with FSS 943.1717, prior to being authorized to utilize and/or carry the TASER®, Officers must successfully complete the initial certification training course. This course of instruction must be a minimum of four (4) hours duration.
   a. The option of being exposed to the effects of the TASER® during training shall be at the discretion of the individual officer(s).

2. In accordance with FSS 943.1717, officers shall be required to attend re-current training for the TASER®, at a minimum, on an annual basis. This course of instruction must be a minimum of one (1) hour duration. [CFA 14.11D]

3. Only authorized/certified TASER® instructors shall provide training in the use of the TASER®.

4. Air cartridges used for training are to be marked for training, and are to be replaced by their expiration date(s).

**H. TASER® Revocation:**

1. Approval to carry and/or utilize the TASER® may be revoked at the discretion of the Chief of Police and/or at any point that an officer has demonstrated an inability or unwillingness to strictly adhere to established Departmental policy regarding the use of the TASER®.

Mark P. Klayman
Chief of Police
Cocoa, Florida

COCOA000000173